# EXHIBIT A

Treg R. Taylor, Attorney General
Margaret Patton Walsh
Department of Law
1031 W. Fourth Avenue, #200
Anchorage, AK 99501
Telephone: 907.269.5100

David Karl Gross
Mara E. Michaletz
Birch Horton Bittner & Cherot
510 L Street, #700
Anchorage, AK 99501
Telephone: 907.276.1550

Linda Singer (pro hac vice to be submitted)
Elizabeth Smith (pro hac vice to be submitted)
Motley Rice LLC
401 Ninth Street, N.W., #1001
Washington, DC 20004
Telephone: 202.386.9626

Attorneys for Plaintiff

## IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
## THIRD JUDICIAL DISTRICT IN ANCHORAGE

THE STATE OF ALASKA, )
)
    Plaintiff, ) Case No. 3AN-23-*08083* CI
)
vs. )
)
EXPRESS SCRIPTS, INC., EXPRESS )
SCRIPTS ADMINISTRATORS, LLC, )
MEDCO HEALTH SOLUTIONS, ESI )
MAIL PHARMACY SERVICE, INC., )
EXPRESS SCRIPTS PHARMACY, INC., )
)
)
    Defendants. )
_____ )

## COMPLAINT

The Plaintiff, the State of Alaska ("the State" or "Plaintiff"), brings this action against

Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, ESI Mail

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 2 of 90

Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc. (referred to collectively herein as "Express Scripts," "ESI," or "Express Scripts Defendants") in order to abate the public nuisance caused in substantial part by these Defendants' unreasonable acts and omissions fueling the opioid epidemic. Express Scripts collaborated with opioid manufacturers, partnering with them in the deceptive, dangerous marketing of these all too often lethal drugs and, in exchange for rebates and other payments from opioid manufacturers, placed opioids on formularies with preferred status and with little to no limits on their approval for use. In addition, instead of reporting illegitimate prescribing and sales uniquely visible to it in the extensive data it collects, Express Scripts ignored evidence of misuse, addiction, and diversion and used its data to boost its profits and manufacturers' sales at the expense of public health and safety. In support of its claims, the Plaintiff states as follows:

## INTRODUCTION

1.     This case arises from the worst man-made epidemic in modern medical history— an epidemic of addiction, overdose and death caused by an oversupply of opioids flooding communities from powerful corporations who sought to profit at the expense of the public.

2.     By now, most Americans have been affected, either directly or indirectly, by the opioid disaster. Due in substantial part to the wrongful conduct of the largest pharmacy benefit managers (PBMs) in the nation, described further below, the amount of prescription opioids sold annually in the U.S. quadrupled between 1999 and 2010. In 2016, 289 million prescriptions for opioids were filled in the U.S.—enough to medicate every adult in America around the clock for a month. Since the push to expand prescription opioid use began in the late 1990s, the death toll has steadily climbed, with no sign of slowing. The CDC's National Center for Health Statistics provides provisional data on drug overdose deaths. According to the data, there were an estimated 107,622

drug overdose deaths in the United States during 2021. That is nearly a 15% increase from the estimated deaths in 2020.

3.     From 1996 through 2019, nearly 500,000 people died from an overdose involving any opioids. The prescription opioids involved in these deaths include brand-name prescription medications like OxyContin, Opana ER, Vicodin, Subsys, Duragesic, and Ultram, as well as generics like oxycodone, hydrocodone, tramadol, and fentanyl.

4.     Many of the overdoses from non-prescription opioids are also directly related to prescription pills. Many opioid users, having become addicted to but no longer able to obtain prescription opioids, have turned to heroin. According to the American Society of Addiction Medicine, 80% of people who initiated heroin use in the past decade started with prescription painkillers—which, at the molecular level and in their effect, closely resemble heroin. In fact, people who are addicted to prescription painkillers are 40 times more likely to become addicted to heroin, and the CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. Individuals who used prescription opioids who have turned to heroin are now frequently exposed to illicit fentanyl, with even more lethal effects.

5.     As a result, in part, of the proliferation of opioid pharmaceuticals between the late 1990s and 2015, the life expectancy for Americans decreased repeatedly for the first time in decades. Drug overdoses are now the leading cause of death for Americans of every age from 22 to 68.

6.     In the words of Robert Anderson, who oversees death statistics at the Centers for Disease Control and Prevention, "I don't think we've ever seen anything like this. Certainly not in modern times." On March 6, 2017, Governor Walker stated that "Alaska is in the grips of a tragic opioid epidemic." On October 27, 2017, then-President Trump declared the opioid epidemic a

public health emergency. Since that time, Health and Human Services Secretary Xavier Becerra has twice renewed the determination that "a opioid public health emergency exists nationwide."

7.      According to the CDC, the number of drug overdose deaths increased by nearly 30% from 2019 to 2020 and has quintupled since 1999. Nearly 75% of the 91,799 drug overdose deaths in 2020 involved an opioid. From 1999 to 2020, more than 263,000 people died in the United States from overdoses involving prescription opioids.

8.      In 2021, there were 201 opioid overdose deaths in Alaska, which accounted for 77% of all drug overdose deaths in the state.

9.      Drug overdose death rates increased in Alaska from 8.7 per 100,000 in 2011 to 27.6 per 100,000 in 2021. This is faster than the increase in overdose deaths in the United States as a whole where, over the same period of time, drug overdose rates increased from 7.3 to 24.7 per 100,000. The following chart illustrates this point:



Drug Overdose Deaths Per 100,000
Population, 2011-2021

— Alaska  — United States

35.6
32.4

SOURCE: KFF analysis of CDC Multiple Cause of Death 2011-2021 on CDC WONDER Online Database.

KFF

10.     The loss of each of these individuals cannot be adequately conveyed by statistics, nor can the depth and breadth of the impact on those who survive. Because the addictive pull of opioids is so strong, relapse is more common than with other drugs.

11.     The damage inflicted cuts across ages and generations. Many who have succumbed to overdoses have overdosed more than once. Those who overdose are often not alone at the time. Family members, including young children, have watched their loved ones lose consciousness or die. Young children, including toddlers, also have been the direct victims of overdoses themselves after coming into contact with opiates.

12.     Further, overdose deaths are not the only consequence. Children are being displaced from their homes and raised by relatives or placed in the care of the State due to parents' addiction. Others lose the chance to go home. Unable to be discharged from the hospital with their mothers, babies born addicted to opioids due to prenatal exposure are being placed in the care of the State or local citizens or non-profits who do their best to comfort them through the pain of withdrawal.

13.     The opioid crisis was fueled and sustained by those involved in the supply chain of opioids, with manufacturers, distributors, pharmacies, and Pharmacy Benefit Managers ("PBMs"), including Express Scripts, each playing a role.

14.     PBMs, like Express Scripts, are administrators hired by third-party payors (*e.g.*, government entities, insurers, employers) to design and administer prescription drug programs. They are paid for their services by the third-party payor, as well as through a variety of other avenues they have developed as part of their business model. Their industry began with limited fiscal and administrative functions but has since evolved into far more. Now, "[a]lthough many

people have never heard of [them], these powerful middlemen have enormous influence over the U.S. prescription drug system."

15.    Whether by colluding with manufacturers deceptively marketing opioids to alter perceptions of opioids and increase their sales and use, pursuing further profits by placing opioid drugs on their formularies with preferred status and declining to impose limits on their approval for use in exchange for manufacturer rebate payments and fees, ignoring evidence of misuse, addiction, and diversion in the massive data they possess and instead leveraging that data in support of efforts to expand opioid sales and maintain oversupply, failing to report suspicious prescribers to law enforcement, and failing to adequately monitor for, identify, and refuse to fill suspicious prescriptions, PBMs have operated behind the scenes to fuel the crisis in multiple respects, while concealing their role and claiming concern for the public health.

16.    PBMs are supposed to work for their clients to reduce prescription drug costs. Yet, over time, PBMs have developed a business model that does the opposite, and in doing so, they have adopted business practices designed to increase the utilization of opioids and maximize their own profits. As a result, far greater quantities of prescription opioids entered the market than Express Scripts knew could be necessary for legitimate, safe, or appropriate medical uses.

17.    PBMs' overall business practices have not gone unnoticed in Alaska. Since 2018, Alaska has required pharmacy benefit managers to be licensed. House Bill 240, improved prescription price transparency for patients and included guidelines for PBMs. It also required that "PBMs provide pharmacies with the methodology and sources used to determine the drug pricing list. This information must be provided at the beginning and renewal of the pharmacy's contract."

18.    Nationally, a small number of PBMs dominate the market in their sphere. Express Scripts is the largest stand-alone PBM in the nation and the self-described manager of the pharmacy

benefit for more than 100 million Americans, providing PBM services to its parent, Cigna, as well as to many other insurers and payors.

19.     Express Scripts is also one of the largest pharmacies in the country, and is owned by one of the largest insurance companies in the world, Cigna. In addition, Express Scripts is one of the largest healthcare data, consulting, and analytics companies in the United States.

20.     Express Scripts is a major player in Alaska as well. As of at least 2022, Express Scripts was by far the largest PBM in the State.

21.     Express Scripts controls pharmacy networks that include various retail pharmacies throughout the country, including pharmacies in Alaska. Express Scripts' pharmacy network includes "nearly 64,000 pharmacies," which it contends provides an available in-network retail pharmacy within a 15-minute drive of "nearly every member's home."

22.     Express Scripts also dispenses prescription opioids through its mail order pharmacies, serving patients nationally and throughout Alaska.

23.     PBMs such as Express Scripts have more control over and insight into the flow of opioids into communities across the country than any other entities in the pharmaceutical distribution and payment chain.

24.     Because PBMs have access to data for all drug prescriptions written for individuals who receive insurance from an insurer with whom the PBM has contracted, PBMs have a unique insight into prescribing habits at both the patient and prescriber levels, as well as data on prescribing and use of opioids in the aggregate. Express Scripts has especially broad and deep insight, because of the expansive reach of its business. Express Scripts has access to and analyzes opioid utilization data for its approximately 100 million covered lives. Through that data, Express Scripts could

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 8 of 90

effectively track the opioid epidemic, pill-by-pill, as it unfolded over decades and chronicle the opioid epidemic in real time.

25. However, instead of using its data to guard against diversion and public harm, or to report suspicious prescribers, Express Scripts used it to further its own profits. This included offering services, in exchange for lucrative "administrative fees" ostensibly associated with administering benefits or contracts, to Purdue and other manufacturers of opioids to help them plan their marketing efforts and boost their sales. At the same time, Express Scripts colluded with manufacturers to further support sales, and its own profits, through favorable placements of opioids on its standard national formularies without limits on their approval for use, paid for by manufacturers through rebates and fees.

26. Given Express Scripts' dominant position in the market and its level of expertise, clients typically accept its offered baseline standard formularies with little to no modifications. This is not surprising, as customers hire PBMs for their specialized knowledge in constructing and managing prescription drug formularies and policing pharmacy networks. In addition, there are often significant financial penalties customers incur for deviating from standard formularies. Thus, PBM's formularies effectively control what opioids enter the marketplace and with what restrictions. As such, PBMs are uniquely situated to address the opioid crisis, influence Express Scripts has admitted in making belated, partial remedial efforts as it came under public scrutiny and pressure.

27. Indeed, Express Scripts touts its substantial influence over nationwide drug utilization as one of its strongest selling points to its customers. Express Scripts is not a bystander in the opioid crisis; it helped fuel the fire.

28.     Although Express Scripts' role in creating and sustaining the opioid epidemic is largely hidden from public scrutiny, it nevertheless facilitated the reckless promotion of opioids by manufacturers, the oversupply of opioid shipments by distributors, and the irresponsible dispensing of prescription opioids by numerous pharmacies, including through direct support and sales from its own mail order pharmacies.

29.     Express Scripts' conduct has had a severe and far-reaching public health consequence, the costs of which are borne by the State and other governmental entities.

30.     Express Scripts' conduct has created a public nuisance and a blight. Governmental entities, and the services they provide their citizens, have been strained by this public health crisis.

31.     The State brings this suit to help address the devastating march of this epidemic and to hold Express Scripts responsible for the crisis it helped create.

### JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this action pursuant to Alaska Statutes §§ 22.10.020 and 45.50.501.

33.     This Court has personal jurisdiction over Defendants because Defendants transact business in Alaska and/or have the requisite minimum contacts with Alaska necessary to constitutionally permit the Court to exercise jurisdiction, with such jurisdiction also being proper under Alaska's long arm statute, as codified in Alaska Statutes § 09.05.015.

34.     Venue is proper in this Court pursuant to the Third Judicial District at Anchorage pursuant to Rule 3 of the Alaska Rules of Civil Procedure, in that many of the unlawful acts committed by Defendants were committed in Anchorage.

35.     The Attorney General has determined that pursuit of this action is in the public interest, as required by Alaska Statutes § 45.50.501(a).

## A. The State of Alaska

36. The State of Alaska brings this action, by and through its Attorney General Treg Taylor, in its sovereign capacity to protect the interests of the State and its citizens. The Attorney General brings this action pursuant to his constitutional, statutory, and common law authority, including the authority granted to him by the Alaska Consumer Protection Act, Alaska Statutes § 45.50.471 *et seq.*

## B. Defendants

37. **Defendant Express Scripts, Inc.** is a Delaware corporation registered to do business in Alaska with its principal place of business in St. Louis, Missouri.

38. During the relevant time, Express Scripts, Inc. was directly involved in the PBM and mail order services businesses, as well as Express Scripts' data and research services.

39. **Defendant Express Scripts Administrators, LLC** (f/k/a Medco Health, LLC) is a Delaware limited liability company. Express Scripts Administrators, LLC is registered to do business in Alaska with its principal place of business located at One Express Way, St. Louis, Missouri.

40. During the relevant time, Express Scripts Administrators, LLC provided PBM services in Alaska, as alleged in this Complaint.

41. **Defendant Medco Health Solutions, Inc.** (f/k/a Merck-Medco Managed Care LLC) ("Medco") is a Delaware corporation registered to do business in Alaska with its principal place of business located at One Express Way, St. Louis, Missouri.

42. Express Scripts acquired Medco in 2012 in a $29.1 billion deal.

43.     Prior to the merger, Express Scripts and Medco were two of the largest PBMs in the United States. Medco provided PBM services to approximately 62 million members and provided mail order and data research services to customers nationwide.

44.     Following the merger, the combined company continued under the name Express Scripts. All of Medco's PBM, mail order pharmacy, and data and research business was combined into Express Scripts, and all of Medco's customers became Express Scripts' customers. Express Scripts, Inc. became the largest PBM in the nation, filling a combined 1.4 billion prescriptions for employers and insurers.

45.     As a result of the merger, Express Scripts Holding Company ("ESHC") was formed. In 2018, Cigna Corp. purchased Express Scripts Holding Company for $54 billion, a merger publicized as having the potential to use aggregated data to improve products and services.

46.     In October of 2020, Express Scripts Holding Company changed its name to Evernorth Health, Inc. ("Evernorth"). Evernorth, located at One Express Way, St. Louis, Missouri, is the indirect parent of Express Scripts, Inc., along with pharmacy and research subsidiaries that operate throughout Alaska.

47.     **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is an indirect subsidiary of Evernorth. ESI Mail Pharmacy Service, Inc. is registered to do business in Alaska with its principal place of business located at One Express Way, St. Louis, Missouri.

48.     ESI Mail Pharmacy Service, Inc. dispenses opioids nationwide, and, upon information and belief, dispensed opioids into Alaska during the relevant time period as a mail order pharmacy.

49.     **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is an indirect subsidiary of Evernorth. Express Scripts Pharmacy, Inc. is registered to do business in Alaska with its principal place of business located at One Express Way, St. Louis, Missouri.

50.     Express Scripts Pharmacy, Inc., upon information and belief, dispensed opioids into Alaska during the relevant time period as a mail order pharmacy.

51.     Evernorth is the indirect parent of and shares a physical address with Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions, and its website includes links to both Express Scripts "Pharmacy Benefits Management" and "Express Scripts Pharmacy." "Express Scripts Pharmacy" is described as providing home delivery pharmacy services.

52.     As a unit, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions was the third largest dispensing pharmacy in the United States for the 2006 – 2014 time period.

53.     Collectively, Defendants Express Scripts, Inc., Express Scripts Administrators LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to herein as "Express Scripts," "ESI," or "Express Scripts Defendants."

54.     In 2022, Evernorth, in large part through Express Scripts' PBM and mail order pharmacy business, generated revenue of $140.34 billion, contributing more than 75% of Cigna's revenue in 2022.

55.     Express Scripts is named as a defendant for its conduct as:

- a PBM;

- a data, analytics, and research provider; and

- a mail order pharmacy (i.e. a dispenser).

At all relevant times, Express Scripts performed these services in Alaska.

## FACTUAL ALLEGATIONS

## I. A few large PMBs exert substantial influence in a way that is often not transparent, even to their customers.

### *What are PBMs?*

56.     "Pharmacy Benefit Managers (PBMs) are a little-known but important part of the process by which many Americans get their prescription drugs," and are "a key player in the prescription-drug supply chain[.]"

57.     "According to the Pharmaceutical Care Management Association (PCMA), the PBM trade group, PBMs process prescriptions for the vast majority of Americans." Although there exist dozens of PBMs nationwide, a select few, including ESI, dominate the market, as described above.

58.     PBMs are companies that administer prescription drug plans for entities that include insurers, self-insured employers, and state and federal government agencies (collectively, these entities are referred to as "plan sponsors"). PBMs review and pay claims. PBMs also review and decide "which medications are most effective for each therapeutic use."

59.     PBMs design prescription drug benefit programs and create national formularies which set the criteria and terms under which pharmaceutical drugs are reimbursed. They determine the number of pills per prescription, number of refills permitted, any pre-authorization requirements, co-payment amounts, and other criteria. PBMs thereafter commit to manage their customers' drug plans and monitor their customers' utilization, including through concurrent drug utilization review ("Concurrent DUR" or "cDUR").

60. Concurrent drug utilization review involves the PBMs real-time evaluation of drug therapy for potential problems, including over-utilization and clinical abuse/misuse of prescribed drugs. Express Scripts' cDUR terms in its standard client contracts required it to conduct concurrent DUR at the point of sale on all prescriptions.

61. A PBM's plan can determine what medications will (or will not) be available, at what quantity and dosage, and how difficult it may be for a patient to receive that medication (e.g., by requiring pre-authorization).

62. A drug ~~formulary is a list of generic and brand name prescription drugs covered by~~ health plans. They are the pathways by which opioids and other drugs are dispensed across the country. Formularies are usually divided into three to five tiers that determine consumers' cost-share amounts, or the co-payment or co-insurance consumers must pay toward the cost of a prescription. The lower tiers have lower cost-share amounts than the higher tiers. For example, a typical three-tier formulary may be designed as follows:

> Tier 1: contains generic drugs with the lowest cost-share amount for consumers;
>
> Tier 2: contains preferred brand-name drugs with a cost-share amount that is higher than tier 1 but lower than Tier 3;
>
> Tier 3: contains non-preferred brand-name drugs with the highest payment by consumers.

63. In essence, because PBMs choose which drugs appear on their formularies and their standard formularies are adopted by a large number of health insurers and payors, they wield significant influence over which drugs are disseminated throughout Alaska and how those drugs are paid for.

64. At the pharmacy counter, PBMs can implement "Utilization Management" ("UM") tools, which help to control the flow of prescription drugs. These tools include quantity limits, refill

limits, prior authorizations ("PA"), and step edits (which require that a patient try a safer or less expensive drug before being given a more dangerous or more expensive one).

65.    PBMs wield direct, intentional control and influence over the prescribing, dispensing, reimbursement, and consumption of opioids.

66.    Express Scripts' standard plan designs and formularies control:

      a.  Which opioids will be available (or not available) to patients;

      b.  In what quantities the opioids will be dispensed;

      c.  At what co-pay the opioids will be dispensed;

      d.  What level of authorization will be required for the dispensing of opioids to a consumer patient; and

      e.  What less addictive pain treatments, beneficial drugs or other treatments will not be available.

67.    ESI performed all these tasks for various large insurers in Alaska, thereby administering prescription drug plans for hundreds of thousands of Alaska residents. ESI performed these tasks for State residents who received insurance from their employers or other payors that utilized ESI as their PBM.

68.    Express Scripts represents to its clients, patients, and the public that it designs its formularies and drug programs in a manner that promotes safe use and appropriate prescribing of opioids. For example, Express Scripts claims that its Pharmacy and Therapeutics Committee (the "P&T Committee") considers drug safety and efficacy and "fully compl[ies] with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of safety and efficacy." Express Scripts also claims that it uses drug utilization review to "review prescriptions for safety and effectiveness, in real-time, electronically and systematically, when presented to . . . pharmacies" and that it will "alert the

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 16 of 90

dispensing pharmacy to detected issues." In actuality, Express Scripts has designed its formularies and benefit programs in a manner that maximizes its own profits, and has refused to use its drug utilization review process to identify and control opioid misuse, fueling the opioid crisis as a result.

### PBMs and Financial Incentives from Manufacturers

69.     Opioid manufacturers cannot effectively influence drug prescribing and opioid utilization alone. Other participants in the drug distribution and reimbursement system play key roles in the availability of their opioids.

70.     Using their market power, PBMs, including ESI, require and receive incentives from manufacturers to keep certain drugs on and off formularies. They also receive incentives from manufacturers through lucrative administrative fees.

71.     Drug manufacturers compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization and other utilization management tools that would slow down flow, such as quantity limits, refill limits, and step edits. PBMs' ability to negotiate these incentives from drug manufacturers derives from their control of the factors driving utilization, including formulary development and plan design.

72.     Generally, prescription drug manufacturers pay higher rebates for preferred formulary placement on lower tiers (i.e., tier 2 status instead of tier 3 status). This is because prescribers are more likely to write prescriptions and consumers to fill prescriptions for drugs with lower cost-share amounts.

73.     Higher priced drugs will typically generate higher rebates. This creates an incentive to grant favorable formulary placement to brand-name, higher priced drugs such as OxyContin, a frequently diverted opioid.

74.     Under a traditional PBM pricing model, PBMs retain a portion of the payments they receive from prescription drug manufacturers and return the remainder to their third-party health plan clients. Administrative fees are not passed on, which has prompted disputes and concerns over whether rebate payments are being disguised as other revenue, such as administrative fees.

75.     Since 2014, payments to PBMs by manufacturers as rebates or fees to ensure the formulary placement of their drugs have risen by 16% per annum, and now constitute 40% or more of branded prescription drug costs.

76.     The rebates PBMs negotiate are highly confidential and, for the most part, the exact terms of the agreements between PBMs and prescription drug manufacturers are unknown to others in the supply chain and their customers – creating a pricing black box.

77.     Additionally, Express Scripts obtains revenue through fees from maintaining pharmacy networks, profiting from the "spread" between what clients pay them for generic prescription drugs and the amounts the PBMs reimburse to pharmacies. In addition, retail pharmacies pay Express Scripts fees for every opioid sold, and Express Scripts reimburses the pharmacies based on the lowest available published prices while paying its own mail order pharmacies based on higher published prices for the same drugs. In other words, the more filled prescriptions a PBM administers, the higher profit it earns.

78.     Express Scripts further increased its profits from generic opioids by failing to put into place utilization management tools that would have reduced illegitimate use and dissemination of these drugs.

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 18 of 90

79. Much of this activity is not transparent to anyone, including those who, in good faith, hire PBMs to manage their benefits. Express Scripts used its position to collude with manufacturers, prioritizing its own profits instead of the public health.

80. Express Scripts links opioid manufacturers to prescribing physicians, pharmacists, clients, and consumers with the objective of influencing drug utilization. Internal documents revealed that the ███████████████████████████████████████████████

███████████████████████████████████

81. As part of their business model, Express Scripts offers services to assist manufacturers in the marketing of drugs in other ways as well, providing manufacturers with detailed prescribing data that furthered their marketing efforts, as described further below.

82. On information and belief, and as described below, Express Scripts engaged in all these practices in Alaska.

## II. ESI Had Access to Data Indicating Diversion, Misuse, and Abuse of Opioids But Failed to Use it to Make Meaningful Efforts to Prevent Diversion

83. Armed with a wealth of information and data, ESI knew or should have known of the dangerous prescribing patterns that demonstrated issues like diversion, misuse, abuse, doctor shopping, overdose, and outsized use in the State. Yet, upon information and belief, ESI took no steps to report or address outlier prescribers or pharmacies or to otherwise rein in the facially suspicious volume of opioids being dispensed in the State or throughout the country.

84. Instead, as described further below, ESI provided manufacturers with preferred formulary status without restrictions and aided their marketing efforts even though they knew that dangerous numbers of opioids were being utilized in the State and the nation and were causing an unprecedented crisis of addiction, overdose, and death.

85.    For the entire relevant time period, ESI had access to extraordinary data which they extensively reviewed and analyzed for various profit-making business objectives.

86.    ESI has publicly acknowledged its unique ability to collect data. An ESI representative has stated, "Because Express Scripts interacts with patients, pharmacies, prescribers, payors, our company is uniquely situated to collect data when patients receive and fill a prescription for an opioid under pharmacy benefit."

87.    ESI also recognized the value of its data. ████████████████████

████████████████████████████████████████████████

████████████████████████████

88.    Apart from its research arms, ESI can monitor its clients' opioid utilization and the overall utilization of particular opioids. It has extraordinary data across the opioid supply chain, including data showing: the volume, nature, dosage, and conditions for which health care providers are prescribing opioids to individual patients and on an aggregate basis; the volume of opioids obtained by individual patients and by geography; the pharmacies at which opioids were dispensed and the volume of opioids dispensed by geographic area, among other data. ESI also tracks the number of opioids that move through its own mail order pharmacies.

89.    At the individual level, ESI could monitor its data to identify conduct commonly associated with opioid misuse, addiction, and diversion, such as early refills of opioid prescriptions, multiple prescriptions for one individual or for dangerously high volumes or dosages of opioids or "doctor shopping," the practice by which individuals receive multiple opioid prescriptions from unknowing prescribers. On the prescriber level, it could identify problematic prescribers who were prescribing unreasonably high volumes of opioids to unreasonably high numbers of patients, co-prescribing opioids with drugs commonly abused with them, such as benzodiazepines or the "Holy

Trinity", prescribing opioids outside the regular scope of their practice, or who wrote prescriptions for the same dose and duration to all of their patients – all classic signs of "pill mills."

90.     Thus, ESI like other PBMs, can see detailed information on individual prescribers, prescriptions, and pharmacies, but can also aggregate that data across manufacturers, patients, pharmacies, and payors. ESI's insight is both uniquely granular and comprehensive.

91.     ESI tracked pill-by-pill data by employing advanced data analytics collected from hundreds of millions of pharmacy claims. The data showed nearly every aspect of the pills' movement through the prescription drug distribution and payment systems.

92.     Express Scripts had access to all of this data well before Alaska and other states established their Prescription Drug Monitoring Programs in order to perform these analyses and stem the tide of the opioid crisis.

93.     Express Scripts represented that it would identify potential fraud and abuse, giving rise to an expectation that it was identifying and addressing instances of over-prescribing and diversion. Instead, it was making business decisions to increase its bottom line while eliminating patient safeguards in exchange for more lucrative contracts with manufacturers.

94.     Although ESI was acutely aware of the opioid epidemic, it failed to use its extensive data to combat it, and instead helped to maintain the flow of opioids. ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

95.     ███████████████████████████████████████████

███████████████████████████████████████████████

[REDACTED] ESI's own data demonstrated these problems as well.

96.     ESI was directly involved in the administration of Purdue's Indigent Patient Assistance Program ("IPAP"), [REDACTED]

[REDACTED]

97.     [REDACTED]

[REDACTED]

[REDACTED] Although the data could have been readily used to detect potential addiction and misuse, the Purdue-ESI partnership was focused more on ensuring the continued availability of Purdue's opioid products.

98.     [REDACTED]

[REDACTED]

99.     Through the IPAP program in particular, ESI had a ringside seat to, and an active role in, the earliest rounds of the opioid epidemic. [REDACTED]

[REDACTED]

100.



101.

102.

103.

104. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

105. Outside of the IPAP program, ESI's own data capacities allowed the company to identify inappropriate use and prescribing of opioids, as seen in drug trends reports, research posters, and the 2014 ESI report *A Nation in Pain*. The report discussed the results of Express Scripts' review of 36 million opioid pharmacy claims, and detailed the indicia of the opioid epidemic that was apparent in the data. *A Nation in Pain* notes that the study found that 60% of patients using opioids were taking a dangerous combination of drugs that are potentially fatal, such as benzodiazepines with an opioid. The study also noted that a separate Express Scripts study that analyzed ESI's data found that 40% of opioid prescriptions filled by members with employer sponsored drug coverage between 2011 and 2012 were written by only 5% of prescribers.

106. This unique access alerting ESI to the problems with opioids, should have triggered a robust data review to identify signs of misuse, abuse and diversion. This is particularly true, ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████ Yet, ESI continued its

efforts to reduce barriers to OxyContin use, and promote higher volumes of opioid prescribing.

107.    While ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

108.    ESI knew or should have known from its own data that opioid abuse, overdose, and
diversion were rising with the increasing amount of opioids that were being dispensed in the State—
and yet it failed to take any of a number of steps it could have taken to stop it. For example, ESI
could have implemented policies that provided easier access to non-addictive forms of pain relief,
or that covered alternative, non-medication treatments for pain, or made addiction treatments more
accessible.

109.    ESI however, continued to prioritize its profits and decline to do anything
meaningful about the opioid crisis.

110.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

**III. Express Scripts Worked Directly With Manufacturers to Boost Opioid Sales and Aid Deceptive Marketing**

### A. Background on Opioid Manufacturers' Deceptive Marketing of Opioids

111.   As Purdue developed OxyContin in the mid-1990s, it knew that to expand its market and profits, it needed to change the perception of opioids from medications that were appropriate only for short-term acute pain or for palliative (end-of-life) care to medications that could be used long-term for widespread chronic conditions, like back pain, migraines, and arthritis. Purdue, together with other opioid manufacturers, such as Teva, Janssen, and Endo, cultivated a narrative that pain was undertreated and pain treatment should be a higher priority for health care providers, and that opioids were safe, effective, and appropriate for long-term use for chronic, routine pain conditions.   There were no studies that supported the claim that opioids were appropriate for chronic pain, and the manufacturers failed to disclose the lack of evidence that opioids were safe or effective long-term or the other risks from long-term use of opioids.  Purdue and other manufacturers misrepresented the risk of addiction for pain patients as modest, manageable, and outweighed by the benefits of opioid use.

112.   Purdue and other manufacturers spent hundreds of millions of dollars on promotional activities and materials that continued to falsely deny or trivialize the risk of addiction and overstate the benefits of opioids. They deceptively marketed opioids to prescribers through advertising, websites, and in-person sales calls. They also relied upon paid physician speaker programs, continuing medical education ("CME") seminars, non-credit education programs, treatment guidelines, mass mailings to physicians and patients, and other publications and programs

they developed with patient advocacy groups, professional associations, paid physicians, and other third parties, including Defendants.

113.     The misrepresentations included claims that:

        a.  patients receiving opioid prescriptions for pain generally would not become addicted, and that doctors could use screening tools to exclude patients who might;

        b.  patients who did appear addicted were not; they were instead "pseudoaddicted" and needed more opioids;

        c.  opioids relieved pain when used long-term and were appropriate for use for chronic pain conditions;

        d.  opioids could be taken in higher and higher doses (without disclosing the increased risk to patients);

        e.  OxyContin provided 12 hours of relief (when Purdue knew that, for many patients, it did not);

        f.  opioids would improve patients' function and quality of life (while trivializing or omitting the many adverse effects of opioids that diminish patients' function and quality of life).

114.     Between the 1990s and 2011, prescriptions of oxycodone, an active ingredient in OxyContin and other opioid drugs, more than doubled in the United States. During the same time period, opioid prescriptions increased some 31% from approximately 1.6 million to approximately 2.2 million. According to a U.S. Department of Health and Human Services Fact Sheet, "[i]n 2014,

more than 240 million prescriptions were written for prescription opioids, which is more than enough to give every American adult their own bottle of pills."

115. The opioid manufacturers have faced substantial civil and criminal liability for their roles in creating the opioid public health crisis, and have agreed to pay billions of dollars to address the devastation caused by their misleading marketing and other misdeeds. For example:

    a. In 2007, Purdue agreed to pay approximately $600 million in fines and other payments to resolve criminal and civil charges related to the company's misrepresentations regarding OxyContin's addiction and abuse risks;

    b. In October 2020, the Department of Justice announced that Purdue entered into a federal settlement of more than $8 billion to resolve pending criminal and civil allegations related to its marketing of OxyContin;

    c. In February 2022, the largest U.S. drug distributors and opioid manufacturer Janssen agreed to finalize a proposed $26 billion settlement resolving claims by states and local governments that they helped fuel the opioid epidemic;

    d. In July 2022, Teva announced it would pay up to $4.25 billion as part of a nationwide settlement to end litigation regarding its role in the opioid crisis; and

    e. In August 2022, Endo agreed to pay $450 million to states to resolve opioid lawsuits across the country.

## B. Express Scripts Worked Directly with Manufacturers to Increase Opioid Sales

116. Defendants worked directly with Purdue and other manufacturers to create, provide support for, and disseminate opioid manufacturers' marketing messages in a number of ways. ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

117. █████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████

118. █████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████

119. █████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████

120. In 2007, an internal document related to ████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████

121. █████████████████████████████████████████
███████████████████████████████████████████████

██████ Upon information and belief, these refer to sales roles, such as account executives. ██

██████████████████████████████████████████████

████████████████████████████

122.    ESI cooperated with Purdue and other manufacturers to pursue profits by ████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

123.    ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

124.    ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 30 of 90



125.

126.

127.

This conduct, and the other conduct described herein, aided the overall effort by Purdue to deceptively inflate the benefits of opioids while downplaying their dangers.

**IV. Express Scripts Facilitated and Encouraged the Use of Opioids and Flooded the Market through Self-Serving Formulary and Management Decisions.**

128.    ESI exerts significant control over the prescribing, use, and distribution of opioids throughout the nation, including in Alaska. As described above, ESI determines what drugs are included on their formularies and, as such, what drugs will be reimbursed. In doing so, ESI controls

what drugs are prescribed by doctors, dispensed by pharmacies, and used by patients. Manufacturers tout formulary status of their drugs when marketing the drugs to prescribers, a fact that ESI was well aware of but was not known to the State.

129.     ESI's formularies are heavily influenced by its financial agreements with drug manufacturers, which encourage the use of opioids through preferred formulary placement and ease the prescribing of opioids by lowering copayments and failing to require prior authorization, quantity or dosage limits, or other restrictions on opioid prescriptions.

130.     Prior authorization requires advance approval from a health plan before a prescription drug is delivered to the patient to qualify for insurance coverage. Prior authorization requirements aim to ensure that a medication is necessary or that the patient filling the prescription meets the medical criteria for the use of the medication. These requirements impose an additional but important hurdle to prescribing, which can reduce the illegitimate use and overuse of certain high-risk medications like opioids. ESI's own studies found that ██████████████████

██████████████████████████

131.     ESI's relationship with Purdue demonstrates the inherent problems in these agreements with opioid manufacturers, as well as the way ESI used them to its own advantage. ESI's early preferential treatment of OxyContin facilitated the widespread use and over-use of the drug nationally and in the State, paving the way for the opioid epidemic. Motivated by its own profits, ESI gave OxyContin preferred formulary status on its national formularies and acceded to Purdue's request not to impose prior authorization or other limits on the use of OxyContin.

132.     ██████████████████████████████████

██████████████████████████████████

133. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ These early payments helped gain acceptance and use of OxyContin in the key early years after its launch and laid the foundation for the over-use, misuse, diversion and other harms that followed.

134. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

135. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

136. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

137. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

138. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[REDACTED] (emphasis added)

139.   Express Scripts knew that its placement of OxyContin on its formulary as a
preferred drug [REDACTED] In 2012, an Express Scripts executive acknowledged that

[REDACTED]

[REDACTED] Nevertheless, ESI's preferred

placement of OxyContin continued.

140.   While ESI represents publicly that it approves drugs for its formulary through
exhaustive clinical review based on their efficacy and appropriateness, as well as cost, it was
actually ESI's rebates that drove its decisions. [REDACTED]

[REDACTED]

141.   ESI also allowed Purdue to undermine the policy for prior authorizations, as the
enticing rebates Purdue offered and paid to ESI were conditioned on the elimination or easing of
requirements for prior authorization or other restrictions on OxyContin, while also easing
availability of OxyContin by lowering copays. Thus, in sum and substance, Purdue paid ESI in

order to make OxyContin more available to patients – and ESI complied. As concerns arose regarding quantities prescribed, ESI again prioritized profits from Purdue over health and safety.

142.    In its rebate relationships with PBMs, Purdue prioritized preventing the imposition of prior authorization and other requirements that would limit access to opioids. A former Purdue official responsible for ensuring favorable treatment for OxyContin explained, "We would negotiate a certain rebate percentage for keeping it on a certain tier related to copay or whether it has prior authorization. We like to keep prior authorization off of any drug." The former Purdue official's relationship with Medco was especially important, so much so that, upon information and belief, Purdue moved her geographically to be closer to Medco's New Jersey headquarters.

143.    Express Scripts bowed to Purdue's wishes. For example, as described by a media outlet which obtained unsealed court records from litigation in West Virginia, state officials planned to require prior authorization for OxyContin after noticing a surge in deaths attributable to oxycodone, the branded drug's active ingredient, in 2001. Specifically, 2004 deposition testimony revealed that state officials contacted Medco, with whom it contracted to manage the state's employee health plan, and asked the PBM to put in place a plan to limit OxyContin prescribing, but "basically they were refused." Another state official described similar resistance, testifying that the PBM "felt strongly, and [it was] very, very reluctant or resistant."

144.    ESI even used its large-scale data in an effort to avoid implementing such restrictions, suggesting that in areas other than West Virginia "there were not that many prescriptions for OxyContin, it was not that much of problem."

145.    ████████████████████████████████████

146. Lucrative rebates drove not only decisions regarding formulary placement and prior authorization requirements, but also quantity limits. PBMs determine criteria such as the number of pills per prescription. ████████████████████████████████████

███████████████████████████████████

147. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

148. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

149. ESI recognizes that quantity matters when it comes to the abuse and diversion of opioids, and has acknowledged the problem of excess supply, stating that six in ten patients had or expected to have leftover opioids. Express Scripts has also acknowledged that, "[w]ith a 10-day supply of opioids, 1 in 5 become long-term users." It further cited information from the CDC

showing that 25% of long-term opioid users struggle with addiction, while one in thirty-two people with dosages above 200 MME per day die.

150. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

151. But ESI had long been aware of the effectiveness of UM tools. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

**V. Express Scripts' Publicity of Belated Efforts Effectively Admits It Could Have Acted Sooner**

152. It was not until far too late, in 2017 at the 21st Annual Express Scripts Outcomes Symposium, that ESI announced a "solution" to lower the risks of opioids at each touchpoint of the care continuum "from safe disposal, to tools for physicians at the point of care and safety checks for dispensing pharmacies." By then, it was much too late for the thousands of Alaska residents who were suffering from opioid addiction.

153.   The belated steps that Express Scripts took demonstrate its ability to reduce the supply of opioids through appropriate formulary management—steps that could, and should, have been taken far earlier.

154.   For example, Express Scripts communicated in its 2017 Drug Trend Report that it made several efforts around the opioid epidemic including:

> [E]xtraordinary progress in reducing the amount of unnecessary and dangerous dispensing of opioids to our members through the launch of Advanced Opioid Management (Launched in 9/17).
>
> Average days' supply declined nearly 60% in just 90 days for patients in [the] program receiving a first-time opioid prescription.
>
> Plans participating in their solution observed a 60% reduction in the average days' supply per initial fill, from 18.6 days to just 7.5 days.
>
> Among commercial plans, the days' supply of opioids dispensed per person per year decreased 10.3%, while utilization of drugs to treat opioid dependence rose 8.5%.

155.   It was not until 2018 when Express Scripts released its Advanced Opioid Management (AOM) program, that ESI put covered patients in greater compliance with the CDC Guidelines. The Express Scripts program includes:

   a. First time prescription opioid users are limited to a seven-day supply of short-acting prescription opioids.
   b. Prior authorization is required for the first fill of a long-acting prescription opioid.
   c. Pharmacy intervention is triggered when patient dosage across all prescription opioids reaches a certain level based on MME per day.
   d. Through Express Scripts' proprietary clinical rules engine, the PBM identifies and sends daily alerts to prescription opioid prescribing physicians via their EHR/EMR to make them aware of duplicative therapy, misuse and abuse, medication interactions, use of multiple prescribers or pharmacies, or when their patient is approaching the MME thresholds.

156.     The Advanced Opioid Management programs utilize ESI's ongoing review of claims data that ESI has always had the ability to conduct. There is no legitimate reason why this program, or similar programs, could not have been implemented long before 2018, especially given ESI's early knowledge of the abuse and diversion of opioids.

157.



158.

159.     Express Scripts had the capability to implement such a program long before 2017, but it did not have the corporate will to do so. Instead, for years, it chose to continue in profitable agreements with Purdue and other opioid manufacturers to give opioids preferred status on its formulary without implementing restrictions for their use, inevitably resulting in increased opioid utilization, increased opioid addiction, and increased overdose and death. It also chose to continue partnerships with Purdue and other manufacturers to develop research and provide analyses to assist in manufacturers' deceptive opioid marketing efforts. By 2018 when the company decided to take

action and develop the AOM, more than half a million people had already died from opioid overdose.

## VI. Express Scripts Disregarded Its Obligations Under Both the Federal and Alaska Controlled Substances Acts in Dispensing Opioids from Its Own Pharmacies.

160. ESI operates one of the largest mail order pharmacies in the United States, dispensing opioids to patients in the State as well as throughout the United States. As such, ESI is part of the closed system and is required to comply with the provisions of the federal Controlled Substances Act ("CSA") and the Alaska Controlled Substances Act ("ACSA") (*see* Alaska Stat. § 17.30.020 *et seq.*, incorporating the requirements of the CSA and its implementing regulations).

161. ESI's obligation as a registrant included the responsibility to prevent the diversion of opioids. 21 C.F.R. § 1301.71(a). This includes an obligation to use the information available to it, such as the vast amounts of prescription and prescriber data they maintained or could access, to prevent the diversion of opioids. Upon information and belief, ESI failed to utilize this data to detect or guard against diversion, and otherwise failed to meet its CSA obligations.

162. As a dispenser of opioids, ESI was required to ensure that adequate safeguards were in place to dispense opioids in a safe and effective manner, provide effective controls and procedures to deter and detect theft and diversion, and comply with federal and State controlled substances laws, such as the requirement to maintain effective controls against diversion. *See, e.g.* 21 U.S.C. 801, *et seq.*, Alaska Stat. § 17.30.020 *et seq.* (incorporating requirement to comply with the federal Controlled Substances Act and its implementing regulations).

163. Under the federal Controlled Substances Act and Alaska law, a prescription is legally valid only if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the

prescribing practitioner, but a corresponding responsibility rests with the pharmacies who fills the prescription." *Id.*

164. A pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose. Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose. *See* 21 C.F.R. §§ 1306.04, 1306.06. The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing. ESI failed to meet these obligations in its mail order pharmacy operations.

165. Instead, during the period for which ARCOS data is available (2006-2014), ESI shipped over 1 billion dosage units of opioids to individuals across the nation.

166. Further, as described above, ESI shipped opioids to patients of high-volume prescribers being targeted with Purdue's deceptive marketing campaign.

167. The volume of opioids dispensed by Express Scripts is not surprising, given how its mail order pharmacies operated to push as many prescriptions as possible out the door, with little or no attempts to identify or resolve red flags.

168. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

169. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

170. Express Scripts' mail order pharmacies provided a vehicle for diversion to continue despite efforts to contain it. ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████

171. In 2012, Express Scripts, Inc. and Express Scripts Pharmacy Services, Inc. agreed to pay the U.S. Government $2.75 million to settle a case against the companies. A DEA inspection revealed that from 2002 through 2006, prescription-controlled substances were diverted into illicit channels at several ESI mail order facilities located in Pennsylvania. The diversion included thefts by employees, inventory discrepancies, and failures to report to the DEA losses that occurred during the mail order delivery process. Perhaps most disturbing, the DEA also found that ESI employees generated invalid DEA registration numbers when ESI lacked registration numbers from pharmacists, which should have been not only a red flag, but an absolute barrier to dispensing these drugs.

172. ESI failed to comply with its obligations under federal and Alaska controlled substances laws and failed to use reasonable care in the operation of its mail order pharmacies, permitting an untold number of opioid prescriptions to be filled and the opioids mailed, even though the pills were likely to be diverted.

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 42 of 90

## VII. Express Scripts Concealed Its Unlawful Conduct

173.    Express Scripts' conduct described herein – colluding with manufacturers deceptively marketing opioids to alter perceptions of opioids and increase their sales, ignoring evidence of misuse, addiction, and diversion visible in its data and instead leveraging the data in further support of manufacturers' opioid marketing, placing opioids on its formularies with preferred status and without restrictions in exchange for lucrative rebates and fees from manufacturers, failing to maintain effective controls against diversion in its mail order pharmacy operations, and failing to report suspicious prescribers – was concealed from the State and the public at large.

174.    Express Scripts intentionally undertook efforts to conceal its conduct by misrepresenting its role in the pharmaceutical marketplace as promoting safe and effective use of and appropriate dispensing of opioids, by claiming to be a victim of Purdue's misconduct when it was, in fact, a participant in it, and by failing to make public information in its possession and control that would have revealed the truth regarding its relationships with manufacturers and its financial interest in the increased utilization of opioid medications.

175.    Express Scripts had in its possession and control information that opioids were addictive, data showing that large amounts of opioids were being diverted from legitimate channels, and information that specific doctors and pharmacies were engaged in improper or illegal conduct.

176.    Express Scripts fraudulently hid the details of its relationships with opioid manufacturers.

177.    The State did not and could not have known that Express Scripts developed its formularies based on profit and rebates, not based on the safety and efficacy of the medications as it claims.

178.    The State did not know and could not have known that Express Scripts was partnering with the opioid manufacturers in their deceptive and misleading marketing of opioids.

179.    The State did not know and could not have known about the volume of opioids that Express Scripts filled and shipped into the State through its mail order pharmacy business.

180.    The State did not and could not have discovered through a diligent investigation information demonstrating that Express Scripts was engaged in the misconduct described herein.

181.    Express Scripts did not disclose to the State its financial incentives from Purdue or other manufactures or what it knew regarding problematic prescribers, diversion, and adverse consequences. Express Scripts used its knowledge and scale for its own benefit, rather than its customers', causing injury to the State and the public.

## VIII. Express Scripts Created a Public Health Crisis in Alaska by Dramatically Increasing the Availability of Opioids

182.    By its conduct in improperly increasing opioid prescriptions, failing to address evidence of overuse, abuse, and addiction, and failing to report suspicious prescribers or to adequately monitor for, identify and not fill suspicious prescriptions, Express Scripts, which portrays itself as a champion of public health but had financial incentives to sell higher volumes of opioids, prioritized pursuit of profits over the well-being of the community and even its own clients. This oversupply allowed non-patients to become exposed to opioids and facilitated access to opioids for both patients who could no longer afford or otherwise access prescription opioids and individuals struggling with addiction and relapse. Individuals addicted to prescription opioids often transition to heroin due to its lower cost, ready availability, and similar high, and often become exposed to the even more potent illicit opioid fentanyl.

183.    The effect of the oversupply of opioids in Alaska has been striking. The State faces unique challenges in preventing drug addiction and related crime due to its geographic location and

dispersed population. The City of Anchorage consists of 40% of Alaska's population and is a central hub for narcotics distributed throughout Alaska, including to rural villages. Illegal opioids (illicit fentanyl and heroin) and prescription drugs are currently among the top regional drug threats in Alaska. According to the Department of Health and Social Services, from 2019 to 2020, fentanyl overdose-deaths increased 193% statewide.

184.    In 2008, the rate of prescription drug overdose deaths in Alaska was more than twice that of the United States overall (14.2 versus 6.5 per 100,000 persons, respectively).

185.    In 2011, Alaska saw 66 fatal opioid overdoses; by 2016, that number reached 96, and by 2017, 107—582 deaths over those seven years.

186.    More recently, Alaska has experienced a 68% increase in the number of drug overdose deaths between 2020 and 2021—from 146 drug overdose deaths in 2020 to 245 in 2021. There were 140 fentanyl overdose deaths in Alaska in 2021. Alaska's Chief Medical Officer, Dr. Anne Zink, stated: "This increase continues to be driven primarily by fentanyl, a very powerful opioid often found in counterfeit pills and a variety of illicit drugs, with six out of every 10 drug overdose deaths in Alaska involving fentanyl."

187.    Rising opioid use and abuse have negative social and economic consequences far beyond overdoses. According to an analysis by a Princeton University economist, approximately one out of every three working age men who are not in the labor force take daily prescription pain medication. The same research finds that opioid prescribing alone accounts for 20% of the overall decline in the labor force participation for this group from 2014-16, and 25% of the smaller decline in labor force participation among women. Many of those taking painkillers still said they experienced pain daily.

188.     As a result of the rise in illicit sources of opioids, areas surrounding Anchorage, Fairbanks, and Juneau have been designated as High Intensity Drug Trafficking Areas by the Office of National Drug Control Policy.

189.     Beyond overdoses, Alaska hospitals have struggled to deal with other effects of the opioid epidemic. Dealing with these impacts has become a new normal for doctors and administrators, who report dealing with patients who threaten violence or suicide if they are not given prescription opioids. One doctor described opioids as a daily part of practice from patients seeking refills, to patients with complications associated with injecting opioids, to patients in active withdrawal from opioids. Depending on the day, 15 to 30 of the patients in one emergency department will be there on issues related to opioids, and one doctor described it as surprising to see patients not affected by opioids.

190.     Between 2016 and 2017, hospital visits in Alaska due to opioid overdoses cost more than $23 million. There were 375 opioid overdose emergency department visits between July 1, 2017 and June 30, 2018. In a similar one-year period, from June 1, 2017 to May 31, 2018, Emergency Medical Services and law enforcement administered 550 doses of Narcan, and Project Hope, a state-wide program to get Narcan into the hands of heroin users, distributed 7,082 kits in Alaska.

191.     Between 2012 and 2017, Naloxone administrations by EMS more than doubled, from 8.0 per 1,000 EMS calls in 2012 to 17.7 per 1,000 EMS calls in 2017. Anchorage Fire Department paramedics and emergency responders administered Narcan for suspected overdoses 65 times from the start of January through the end of March 2022 and responded to 43 calls where Narcan had already been administered in a suspected overdose during the same time period.

192.     According to the National Survey on Drug Use and Health, an estimated 60,128 Alaskan adults, 11.5% of the state's population, need substance use disorder treatment. In a single-day count in March 2019, 848 people in Alaska were receiving methadone in opioid treatment programs as part of their substance use treatment (an increase from 331 people in 2015) and 120 people were receiving buprenorphine as part of their substance use treatment (an increase from 91 people in 2015).

193.     Diseases connected to injecting drugs, particularly hepatitis C, are another side effect of opioid and heroin addiction. According to Dr. Jay Butler, Alaska's former Chief Medical Officer and Division of Public Health Director, "[w]e talk mostly about opioid overdose deaths, but there's a lot more that happens related to opioid use than just deaths . . . . The most concerning trend that we see is an increasing number of diagnoses [of hepatitis C in people] age 18 to 29." While there are new direct-acting antiviral drugs to treat hepatitis C, the cost of treatment, approximately $85,000 to $94,500 for two common medications, puts an enormous burden on the state's Medicaid program. In 2015, Alaska's Medicaid program spent $5.9 million on hepatitis C treatments, according to Erin Narus, the lead pharmacist for the state's Medicaid program. The next year, that more than doubled to $13.6 million. The McDowell Group, a research and consulting firm in Alaska, calculated that treating just the estimated 1,009 people in Alaska infected with hepatitis C from injecting drugs in 2015 would cost $90 million.

194.     The oversupply and overuse of opioids have caused additional medical conditions that have injured residents in Alaska. A growing number of people need medications aimed at treating secondary effects of opioids—including not only addiction and overdose, but also side effects like constipation and sedation. According to an analysis by the Washington Post, working-age women and men on opioids are much more likely to have four or more prescriptions from a

physician (57% and 41%, respectively) than their counterparts who do not take opioids (14% and 9%, respectively). These secondary-effect medications—essentially, drugs to treat the effects of opioids—generated at least $4.6 billion in spending nationally in 2015, on top of $9.57 billion in spending on opioids themselves.

195.    The oversupply of opioids has also had a significant detrimental impact on children. Prescription opioid use before high school graduation is related to a 33% increase in the risk of later opioid misuse. Additionally, the adolescent misuse of opioid medications greatly predicts the later use of heroin.

196.    In 2011, the Alaska Youth Risk Behavior Survey began monitoring prescription drug abuse (OxyContin, Percocet, Vicodin, Codeine, Adderall, Ritalin, Xanax). In 2015, 13% of female adolescents and 16% of male adolescents reported using prescription drugs without a doctor's prescription. Students in grade 12 exhibited the highest prevalence of using prescription drugs without a doctor's prescription (19%) followed by students in grade 10 (18%). During 2015–2016, respondents aged 18-25 also had a higher prevalence of reported misuse of prescription pain relievers in the past year.

197.    Across the country there is a significant increase in children being abused, neglected, and eventually separated from their parents due to opioid addiction. Alaska is no exception. From 2012 to 2016, the number of children in foster care in Alaska increased from 1,860 to 2,802, more than 50%—five times the national rate. In 48% of Alaska's foster care placements, parental substance use was a factor. Grandparents have also been caring for children impacted by the opioid epidemic.

198.    Even infants have not been immune to the impact of opioid abuse. There has been a dramatic rise in the number of infants who are born addicted to opioids due to prenatal exposure

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 48 of 90

and suffer from neonatal abstinence syndrome ("NAS," also known as neonatal opioid withdrawal syndrome, or "NOWS"). A State of Alaska epidemiology study of births between 2004 through 2015 found that there was a 566% increase in babies diagnosed with NAS during that time period, from 15 in 2004 to 100 in 2015—541 infants in total over the twelve-year period. According to an Alaskan maternal and child health epidemiologist and study author Abigail Newby-Kew, the study only looks at Medicaid-eligible births because that represents the most complete, long-term data set available. Therefore, these numbers undercount the problem in Alaska.

199.    From 2014 to 2015, 97 babies admitted to Providence Alaska Medical Center's Neonatal Intensive Care Unit ("NICU") had NAS. Dr. Mary-Alice Johnson, the NICU medical director at Providence, stated: "Everybody is concerned about the fact that we're seeing more moms exposed and therefore more babies suffering from neonatal abstinence syndrome."

200.    Defendants' conduct also created an abundance of drugs available for non-medical or criminal use and fueled a new wave of addiction, abuse, and injury.

201.    Most illicit drug use originates from prescribed opioids. It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions. In 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from drug dealers or the internet. The Partnership to End Addiction reports that "[t]wo-thirds of teens and young adults who report misuse of prescription medicine are getting it from friends, family and acquaintances."

202.    Those who are addicted to prescription opioids are 40 times more likely to become addicted to heroin. The CDC identified addiction to prescription pain medicine as the strongest risk factor for heroin addiction. An even more deadly problem stemming from the prescription

opioid epidemic involves illicit fentanyl – a powerful opioid frequently combined with and sold as heroin.

203.    Narcan has been a helpful, life-saving resource for Alaska. In addition to ensuring that all police officers are trained on the use of naloxone in order to reduce fatal opioid overdoses, the State offers training and education to opioid users, their families, and community partners that work or may come into contact with people at risk of overdosing.

204.    The full cost of this human tragedy cannot be calculated or adequately compensated. But the financial costs that are already known are staggering. The McDowell Group estimated that the economic cost of substance abuse and addiction in Alaska amounted to $1.22 billion in 2015 alone. This estimate includes costs related to loss of productivity, traffic collisions, criminal justice and protective services, healthcare, public assistance, and social services.

205.    The proliferation of opioids and the resulting increase in use, misuse and addiction has caused other problems as well. Many patients who become addicted to opioids will lose their jobs. Some will lose their homes and their families. Some will get treatment, but fewer will successfully complete it; many patients will relapse, returning to opioids or some other form of drug. Of those who continue to take opioids, some will overdose – some fatally, some not. Others will die prematurely from related causes – falling or getting into traffic accidents due to opioid-induced somnolence; dying in their sleep from opioid-induced respiratory depression; suffering assaults while engaging in illicit drug transactions; or dying from opioid-induced heart or neurological disease.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (Violations of the Alaska Consumer Protection Act)

206.    Express Scripts engaged in trade or commerce in the State of Alaska.

207.    The Alaska Consumer Protection Act states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful." Alaska Statutes § 45.50.471(a).

208.    The Alaska Supreme Court has determined if actions are unfair or deceptive by inquiring: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, whether it is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

209.    Further, the Alaska Consumer Protection Act lists fifty-seven different trade practices or acts that are expressly considered "unfair" or "deceptive" in violation of the Act, but does not limit violations of the Act to these enumerated practices. Alaska Statutes § 45.50.471(b).

210.    Express Scripts' acts and practices were unfair under Alaska Statutes § 45.50.471(a). These unfair acts or practices include, but are not limited to, ignoring evidence of addiction, abuse, and illegitimate prescribing in their data and failing to implement adequate utilization management measures on opioid prescriptions in exchange for payments from opioid manufacturers, assisting manufacturers in their deceptive marketing schemes that were designed to and did increase utilization of opioids, failing to maintain effective controls against diversion of opioids through their mail order pharmacies in violation of the CSA and ACSA.

211.    In addition, Express Scripts' acts or practices were immoral, unethical, oppressive, or unscrupulous, caused substantial injury to consumers and businesses, and violated public policy aimed at preventing diversion of controlled substances and preventing and treating addiction.

212.     As a direct result of the foregoing deceptive acts and practices, Express Scripts obtained income, profits, and other benefits that it would not otherwise have obtained.

213.     Express Scripts' acts and practices as alleged herein substantially impacted the community of patients, health care providers, law enforcement, and other state government functions, and caused significant actual harm.

214.     Express Scripts' conduct has caused substantial injury to the State—in lives lost to drug overdoses, addictions endured, emergency room visits, the creation of an illicit drug market and all its concomitant crime and costs, and broken lives, families, and homes.

215.     Express Scripts' acts and practices as alleged herein were motivated by a desire to retain and increase its market share and profits.

216.     The State expressly disclaims that it is bringing any claim to enforce—directly or indirectly—the CSA or the ACSA.

217.     Express Scripts' use of acts or practices in violation of the Alaska Consumer Protection Act warrants the maximum civil penalties under Alaska Statutes § 45.50.551.

218.     As a result of Express Scripts' conduct as alleged herein, Alaska consumers, including the State and its agencies, suffered and continue to suffer injury.

219.     In addition to penalties, Express Scripts is liable for attorneys' fees and costs, including costs of investigation, under Alaska Statutes § 45.50.537(d).

## SECOND CLAIM FOR RELIEF
### (Public Nuisance)

220.     A public nuisance is an unreasonable interference with a right common to the general public, such as a condition dangerous to health, offensive to community moral standards, or unlawfully obstructing the public in the free use of public property.

221.     Express Scripts' conduct, as described in the Complaint, involves a significant interference with the public health, the public safety, the public peace, the public comfort and the public convenience, and unreasonably interferes with a public right by creating a public health epidemic in Alaska.

222.     As the Restatement (Second) of Torts explains, "[c]ircumstances that may sustain a holding that an interference with a public right is unreasonable include . . . [w]hether the conduct involves a significant interference with the public health, public safety, the public peace, or the public convenience," that "is proscribed by a statute, ordinance or administrative regulation," or that "is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." § 821B at 87.

223.     Express Scripts' conduct has created an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of the State and its residents.

224.     Express Scripts created or assisted in the creation of a condition that is injurious to public health, public safety, public peace, public comfort, and public convenience, and offends the moral standards of communities throughout the state and significantly harmed a considerable number of the state's residents.

225.     Express Scripts' conduct is proscribed by statutes and regulations, including the Alaska Consumer Protection Act, the ACSA, and the CSA and regulations incorporated therein, in addition to violating the common law of Alaska.

226.     The State expressly disclaims that it is bringing any claim to enforce – directly or indirectly – the CSA or the ACSA.

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 53 of 90

227.    Express Scripts, by colluding with manufacturers to make opioids more available and ignoring evidence of addiction and misuse found in its own claims data and/or other actions and inactions described herein, created and maintained the opioid epidemic in the State, which is harmful and disruptive to and unreasonably annoys, injures, endangers, and interferes with the public health, public safety, public peace, public comfort, and/or public convenience. The public nuisance caused by Express Scripts has significantly harmed the Plaintiff and a considerable number of Alaska residents.

228.    Express Scripts has created and maintained a public nuisance through its ongoing conduct of facilitating and encouraging the use of dangerously addictive opioids by colluding with manufacturers to place opioid drugs on formularies with preferred status, declining to impose limits on their approval for use in exchange for payments and fees from manufacturers, assisting in promoting but failing to disclose the real risks and appropriate limits on the use of opioids, and failing to use the wealth of data available to it to identify and address signs of over-prescribing, illegitimate and dangerous use of opioids, misuse, abuse, and diversion. This conduct caused utilization of opioids to skyrocket, and Express Scripts failed to take measures to restrict opioid utilization even as evidence of the epidemic mounted, including in the State, flooding the State with opioids and facilitating and encouraging the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to the State and its residents.

229.    Express Scripts knew, or should have known, that its intentional, unreasonable, and/or unlawful conduct would and did cause opioids to be used and possessed illegally and that its conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of the State and its residents.

230. Express Scripts' conduct has injuriously affected rights common to the general public, specifically including the rights of the people of Alaska to public health, safety, peace, comfort, and convenience. The public nuisance caused by Express Scripts' actions has caused substantial annoyance, inconvenience, and injury to the public.

231. The interference is unreasonable because Express Scripts' nuisance-creating conduct:

> a. Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;
>
> b. At all relevant times was and is proscribed by state and federal laws and regulations; and/or
>
> c. Is of a continuing nature and, as Express Scripts knows, has had and is continuing to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

232. The significant interference with rights common to the general public is described in detail throughout this Complaint and includes but is not limited to:

> a. The creation and fostering of an illegal, secondary market for prescription opioids;
>
> b. Easy access to prescription opioids by children and teenagers;
>
> c. A staggering increase in opioid abuse, addiction, overdose, injuries, and deaths;
>
> d. Infants being born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;
>
> e. Employers losing the value of productive and healthy employees; and
>
> f. Increased costs and expenses for Plaintiff relating to healthcare services, law enforcement, the criminal justice system, social services, and education systems.

233. Express Scripts knowingly, intentionally, recklessly, and/or unlawfully allowed as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics, resulting in increased addiction and abuse, an elevated level of crime, death and injuries

to the residents of the State, a higher level of fear, discomfort and inconvenience to the residents of the State, and direct costs to the State and its residents.

234.    Express Scripts is liable for creating the public nuisance because the intentional and unreasonable and/or unlawful conduct of Express Scripts was a substantial factor in producing the public nuisance and harm to the State.

235.    Express Scripts' intentional and unreasonable nuisance-creating conduct, for which the gravity of the harm outweighs the utility of the conduct, is described throughout this Complaint and includes:

> a. Facilitating the increased use of opioids by giving opioids unwarranted preferred formulary status in exchange for profiting from payments from opioid manufacturers;
>
> b. Failing to impose prior authorization requirements or limits on the availability of opioids in exchange for payments from opioid manufacturers;
>
> c. Colluding with opioid manufacturers in deceptive marketing schemes that were designed to, and successfully did, change the perception of opioids and cause their prescribing and sales to skyrocket;
>
> d. Ignoring evidence of addiction, abuse, and illegitimate prescribing found in their own extensive data instead of using it to report suspicious prescribers and pharmacies or to enact policies to help address these issues;
>
> e. Failing to maintain adequate safeguards to dispense opioids in a safe and effective manner and to maintain effective controls against diversion of opioids dispensed through their mail order pharmacies; and
>
> f. Failing to report suspicious prescribers and pharmacies.

236.    At all times relevant to this Complaint, Express Scripts knew that increasing the availability of opioids would increase the number of opioids that would be abused, misused, and diverted into the illegal, secondary market and would be obtained by persons with criminal

purposes. Express Scripts also knew, or should have known from its own data, that the marketing by manufacturers with which it colluded was deceptive and that its conduct served to increase opioid sales.

237.    At all times relevant to this Complaint, Express Scripts knew that opioids were dangerous because these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

238.    Indeed, opioids are akin to medical grade heroin. Express Scripts' wrongful and unreasonable conduct of allowing as many opioids onto the market as possible led directly to the public nuisance and harm to the State – exactly as would be expected when medical grade heroin in the form of prescription opioids flood the community and are diverted into an illegal, secondary market.

239.    It was foreseeable to Express Scripts that its conduct would unreasonably interfere with the public health, public safety, public peace, public comfort, and/or public convenience.

240.    Express Scripts' conduct is substantial, unreasonable, intentional, unlawful, reckless, or negligent. It has caused and continues to cause significant harm to the State and its residents, and the harm inflicted outweighs any offsetting benefit.

241.    Express Scripts' conduct is widespread and persistent and creates substantial and ongoing harm. The harm inflicted outweighs any offsetting benefit. Express Scripts' conduct has caused deaths, serious injuries, and a severe disruption of public peace, health, order and safety. Express Scripts' ongoing and persistent misconduct is producing permanent and long-lasting damage.

242.    Express Scripts' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used in the State. Because of Express Scripts' actions in

using its unique position to increase the availability of opioids in the marketplace and inflate opioid sales, because of its collusion with manufacturers in the deceptive marketing of opioids, and because of Express Scripts' special position within the closed system of opioid distribution, without Express Scripts' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

243.  Express Scripts had control over its conduct in and affecting Alaska as is described in this Complaint, and that conduct has had an adverse effect on the public. Express Scripts had sufficient control over, and responsibility for, the public nuisance it created. Express Scripts was in control of the "instrumentality" of the nuisance, namely the dissemination of prescription opioids, its collusion with manufacturers in promoting opioids, and benefit plan design, formulary placement, and drug utilization management that increased utilization of opioids as described herein.

244.  The State has suffered and continues to suffer special injuries distinguishable from those suffered by the general public. As discussed herein, it has incurred and continue to incur substantial harms.

245.  Express Scripts' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence.

246.  The public nuisance – i.e., the opioid epidemic – created, perpetuated, and maintained by Express Scripts can be abated and further recurrence of such harm and inconvenience can be abated.

247.     Express Scripts' misconduct alleged in this case is ongoing and persistent, as is the nuisance to which it substantially contributed.

248.     The State has incurred and will incur expenditures for special programs to abate the nuisance that are over and above the State's ordinary public services.

249.     The State seeks to abate the nuisance created by Express Scripts' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public.

250.     The State's claim for abatement of the public nuisance created by Express Scripts does not implicate or include the recovery of the costs or premiums of Medicaid or any other federal health benefit program.

251.     The State is asserting its own rights and interests and its claims are not based upon or derivative of the rights of others.

252.     The State has suffered an indivisible injury as a result of the tortious conduct of Express Scripts.

253.     Express Scripts acted with actual malice because it acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

254.     The State seeks all legal and equitable relief as allowed by law for public nuisance, including inter alia injunctive relief, abatement, attorneys' fees and costs, pre- and post-judgment interest, and such other relief as this Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the State prays for judgment against Express Scripts as permitted by

Alaska law, as follows:

a.  For a declaration that each Express Scripts Defendant has violated the Alaska Consumer Protection Act;

b.  For an injunction pursuant to Alaska Statutes § 45.50.501 enjoining the Express Scripts Defendants from engaging in any acts that violate the Alaska Consumer Protection Act, including, but not limited to, the unfair and deceptive acts and practices alleged in this Complaint;

c.  For civil penalties in the amount of $25,000 for each and every violation of the Alaska Consumer Protection Act under Alaska Statutes § 45.50.551;

d.  For an injunction permanently enjoining the Express Scripts Defendants from engaging in the acts and practices that caused the public nuisance;

e.  For an order directing the Express Scripts Defendants to abate the public nuisance;

f.  For costs, interest, and attorney's fees; and

g.  For all other relief deemed just by the Court.

DATED this 30th day of August, 2023.

Respectfully submitted,
BIRCH HORTON BITTNER & CHEROT
Attorneys for Plaintiff

By: _____

David Karl Gross, ABA #9611065
Mara E. Michaletz, ABA #0803007
dgross@bhb.com
mmichaletz@bhb.com

STATE OF ALASKA
Treg R. Taylor, Attorney General
Margaret Paton Walsh, ABA #0411074
margaret.paton-walsh@alaska.gov

MOTLEY RICE LLC
Linda Singer (pro hac vice to be submitted)
Elizabeth Smith (pro hac vice to be submitted)
lsinger@motleyrice.com
esmith@motleyrice.com



## Service of Process Transmittal Summary

**TO:**    Shayla Graham
Cigna Companies
900 COTTAGE GROVE RD
BLOOMFIELD, CT 06002-2920

**RE:**    **Process Served in Alaska**

**FOR:**    ESI Mail Pharmacy Service, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | THE STATE OF ALASKA vs. EXPRESS SCRIPTS, INC. |
| **DOCUMENT(S) SERVED:** | Summons and Notice, Notice, Complaint(s) |
| **COURT/AGENCY:** | ANCHORAGE COUNTY - DISTRICT/SUPERIOR COURT, AK<br>Case # 3AN2308083CI |
| **NATURE OF ACTION:** | Summons and Notice to Both Parties of Judicial Assignment |
| **PROCESS SERVED ON:** | C T Corporation System, Juneau, AK |
| **DATE/METHOD OF SERVICE:** | By Process Server on 09/25/2023 at 13:15 |
| **JURISDICTION SERVED:** | Alaska |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after the day you receive this summons |
| **ATTORNEY(S)/SENDER(S):** | David Karl Gross<br>Birch Horton Bittner & Cherot<br>510 L Street, #700<br>Anchorage, AK 99501<br>907-276-1550 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/26/2023, Expected Purge Date: 10/01/2023<br><br>Image SOP<br><br>Email Notification,  Incoming Legal  legalandpublicaffairs-incominglegal@cigna.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>8585 Old Dairy Road, Ste 208<br>Juneau, AK 99801<br>800-448-5350<br>MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT



disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



Wolters Kluwer

## PROCESS SERVER DELIVERY DETAILS

**Date:**                   Mon, Sep 25, 2023
**Server Name:**      Drop Service

| Entity Served | ESI MAIL PHARMACY SERVICE, INC. |
|---|---|
| Case Number | 3AN-23-08083CI |
| Jurisdiction | AK |

| Inserts | | |
|---|---|---|
| | | |



IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA
AT ANCHORAGE

THE STATE OF ALASKA,

)
)
)
_____ )
                    Plaintiff(s),  )
vs.                                )
                                   )
                                   )
EXPRESS SCRIPTS, INC., et al.      )    CASE NO. 3AN- 23 - 08083 CI
                                   )
_____ )      **SUMMONS AND**
                    Defendant(s).  )    **NOTICE TO BOTH PARTIES**
                                   )    **OF JUDICIAL ASSIGNMENT**

To Defendant: ESI Mail Pharmacy Service, Inc.

You are hereby summoned and required to file with the court a written answer to the complaint which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave., Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition, a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented) David K. Gross _____, whose address is:
510 L Street, Suite 700, Anchorage, AK 99501                                          .

If you fail to file your answer within the required time, a default judgment may be entered against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this case, in writing, of your current mailing address and any future changes to your mailing address and telephone number. You may use court form *Notice of Change of Address / Telephone Number* (TF-955), available at the clerk's office or on the court system's website at https://public.courts.alaska.gov/web/forms/docs/tf-955.pdf to inform the court. - OR - If you have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

☒ This case has been assigned to Superior Court Judge Gandbhir _____ . and to a magistrate judge.

☐ This case has been assigned to District Court Judge _____ .

CLERK OF COURT

8/31/23
_____                          By: _____
Date                                          Deputy Clerk

I certify that on 8/31/23 a copy of this Summons was ☐ mailed ☒ given to
☐ plaintiff ☒ plaintiff's counsel along with a copy of the
☐ Domestic Relations Procedural Order  ☐ Civil Pre-Trial Order
to serve on the defendant with the summons.
Deputy Clerk JSN

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If you have been served with this summons outside the United States, you also have 40 days to file your answer.

CIV-100 ANCH (10/17)(cs)
SUMMONS                                          Civil Rules 4, 5, 12, 42(c), 55

Treg R. Taylor, Attorney General
Margaret Patton Walsh
Department of Law
1031 W. Fourth Avenue, #200
Anchorage, AK 99501
Telephone: 907.269.5100
Facsimile: 907.276.3697

David Karl Gross
Mara E. Michaletz
Birch Horton Bittner & Cherot
510 L Street, #700
Anchorage, AK 99501
Telephone: 907.276.1550
Facsimile: 907.276.3680

Linda Singer (pro hac vice to be submitted)
Elizabeth Smith (pro hac vice to be submitted)
Motley Rice LLC
401 Ninth Street, N.W., #1001
Washington, DC 20004
Telephone: 202.386.9626
Facsimile: 202.386.9622

Attorneys for Plaintiff

**COPY**
Original Received

**AUG 3 ℓ 2023**

Clerk of the Trial Courts

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT IN ANCHORAGE

| | |
|---|---|
| THE STATE OF ALASKA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Case No. 3AN-23 08083 CI |
| EXPRESS SCRIPTS, INC., EXPRESS | ) |
| SCRIPTS ADMINISTRATORS, LLC, | ) |
| MEDCO HEALTH SOLUTIONS, ESI | ) |
| MAIL PHARMACY SERVICE, INC., | ) |
| EXPRESS SCRIPTS PHARMACY, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## NOTICE OF FILING COMPLAINT UNDER SEAL

STATE V. EXPRESS SCRIPTS, INC., ET AL.
NOTICE OF FILING COMPLAINT UNDER SEAL
NOTICE OF FILING COMPLAINT UNDER SEAL.DOCX

CASE NO. 3AN-22-06675 CI
PAGE 1 OF 2

COMES NOW Plaintiff, the State of Alaska, by and through undersigned counsel, hereby submits the following Complaint, to be filed under seal. Only the parties and court personnel may view this Complaint. A redacted copy of the Complaint is also submitted herewith for public purposes.

DATED this 31st day of August, 2023.

BIRCH HORTON BITTNER & CHEROT
Attorneys for Plaintiff

By: _David Karl Gross,_

David Karl Gross, ABA #9611065
Mara E. Michaletz, ABA #0803007
dgross@bhb.com
mmichaletz@bhb.com

STATE OF ALASKA
Treg R. Taylor, Attorney General
Margaret Paton Walsh, ABA #0411074
margaret.paton-walsh@alaska.gov

MOTLEY RICE LLC
Linda Singer (pro hac vice to be submitted)
Elizabeth Smith (pro hac vice to be submitted)
lsinger@motleyrice.com
esmith@motleyrice.com



## Service of Process Transmittal Summary

**TO:**   Shayla Graham
Cigna Companies
900 COTTAGE GROVE RD
BLOOMFIELD, CT 06002-2920

**RE:**   **Process Served in Alaska**

**FOR:**   Medco Health Solutions, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | THE STATE OF ALASKA vs. EXPRESS SCRIPTS, INC.<br>Name discrepancy noted. |
| **DOCUMENT(S) SERVED:** | Summons and Notice, Notice, Complaint(s) |
| **COURT/AGENCY:** | ANCHORAGE COUNTY - DISTRICT/SUPERIOR COURT, AK<br>Case # 3AN2308083CI |
| **NATURE OF ACTION:** | Summons and Notice to Both Parties of Judicial Assignment |
| **PROCESS SERVED ON:** | C T Corporation System, Juneau, AK |
| **DATE/METHOD OF SERVICE:** | By Process Server on 09/25/2023 at 13:15 |
| **JURISDICTION SERVED:** | Alaska |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after the day you receive this summons |
| **ATTORNEY(S)/SENDER(S):** | David Karl Gross<br>Birch Horton Bittner & Cherot<br>510 L Street, #700<br>Anchorage, AK 99501<br>907-276-1550 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/26/2023, Expected Purge Date: 10/01/2023<br><br>Image SOP<br><br>Email Notification,  Incoming Legal  legalandpublicaffairs-incominglegal@cigna.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>8585 Old Dairy Road, Ste 208<br>Juneau, AK 99801<br>800-448-5350<br>MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT


disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



## PROCESS SERVER DELIVERY DETAILS

**Date:**                    Mon, Sep 25, 2023
**Server Name:**             Drop Service

| Entity Served | MEDCO HEALTH SOLUTIONS, INC. |
|---|---|
| Case Number | 3AN-23-08083CI |
| Jurisdiction | AK |

| Inserts | | |
|---|---|---|
| | | |



IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA
AT ANCHORAGE

THE STATE OF ALASKA,

)
)
)
                              Plaintiff(s),       )
vs.                                               )
                                                  )
EXPRESS SCRIPTS, INC., et al.                     )     CASE NO. 3AN-23-08083CI
                                                  )
                                                  )     **SUMMONS AND**
                              Defendant(s).        )    **NOTICE TO BOTH PARTIES**
                                                  )     **OF JUDICIAL ASSIGNMENT**

To Defendant: Medco Health Solutions

You are hereby summoned and required to file with the court a written answer to the complaint which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave., Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition, a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented) David K. Gross_____, whose address is: 510 L Street, Suite 700, Anchorage, AK 99501_____.

If you fail to file your answer within the required time, a default judgment may be entered against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this case, in writing, of your current mailing address and any future changes to your mailing address and telephone number. You may use court form *Notice of Change of Address / Telephone Number* (TF-955), available at the clerk's office or on the court system's website at https://public.courts.alaska.gov/web/forms/docs/tf-955.pdf to inform the court. - OR - If you have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

☒   This case has been assigned to Superior Court Judge Gandbhir_____.
     and to a magistrate judge.

☐   This case has been assigned to District Court Judge_____.

                                        CLERK OF COURT

_8/31/23_____                        By: _____
       Date                                          Deputy Clerk

I certify that on 8/31/23 a copy of this Summons was   ☐ mailed  ☒ given to
☐ plaintiff   ☒ plaintiff's counsel along with a copy of the
☐ Domestic Relations Procedural Order   ☐ Civil Pre-Trial Order
to serve on the defendant with the summons.
Deputy Clerk __NJN__

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If you have been served with this summons outside the United States, you also have 40 days to file your answer.

CIV-100 ANCH (10/17)(cs)
SUMMONS                                          Civil Rules 4, 5, 12, 42(c), 55

Treg R. Taylor, Attorney General
Margaret Patton Walsh
Department of Law
1031 W. Fourth Avenue, #200
Anchorage, AK 99501
Telephone: 907.269.5100
Facsimile: 907.276.3697

David Karl Gross
Mara E. Michaletz
Birch Horton Bittner & Cherot
510 L Street, #700
Anchorage, AK 99501
Telephone: 907.276.1550
Facsimile: 907.276.3680

Linda Singer (pro hac vice to be submitted)
Elizabeth Smith (pro hac vice to be submitted)
Motley Rice LLC
401 Ninth Street, N.W., #1001
Washington, DC 20004
Telephone: 202.386.9626
Facsimile: 202.386.9622

Attorneys for Plaintiff

**COPY**
Original Received

**AUG 3 1 2023**

Clerk of the Trial Courts

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT IN ANCHORAGE

| | |
|---|---|
| THE STATE OF ALASKA, )<br><br>Plaintiff, )<br><br>vs. )<br><br>EXPRESS SCRIPTS, INC., EXPRESS )<br>SCRIPTS ADMINISTRATORS, LLC, )<br>MEDCO HEALTH SOLUTIONS, ESI )<br>MAIL PHARMACY SERVICE, INC., )<br>EXPRESS SCRIPTS PHARMACY, INC., )<br><br>Defendants. )<br>_____ ) | Case No. 3AN-23 08083 CI |

## NOTICE OF FILING COMPLAINT UNDER SEAL

STATE V. EXPRESS SCRIPTS, INC., ET AL.
NOTICE OF FILING COMPLAINT UNDER SEAL
NOTICE OF FILING COMPLAINT UNDER SEAL.DOCX

CASE NO. 3AN-22-06675 CI
PAGE 1 OF 2

COMES NOW Plaintiff, the State of Alaska, by and through undersigned counsel,

hereby submits the following Complaint, to be filed under seal. Only the parties and

court personnel may view this Complaint. A redacted copy of the Complaint is also

submitted herewith for public purposes.

DATED this 31ˢᵗ day of August, 2023.

BIRCH HORTON BITTNER & CHEROT
Attorneys for Plaintiff

By: David Karl Gross,

David Karl Gross, ABA #9611065
Mara E. Michaletz, ABA #0803007
dgross@bhb.com
mmichaletz@bhb.com

STATE OF ALASKA
Treg R. Taylor, Attorney General
Margaret Paton Walsh, ABA #0411074
margaret.paton-walsh@alaska.gov

MOTLEY RICE LLC
Linda Singer (pro hac vice to be submitted)
Elizabeth Smith (pro hac vice to be submitted)
lsinger@motleyrice.com
esmith@motleyrice.com

STATE V. EXPRESS SCRIPTS, INC., ET AL.                    CASE NO. 3AN-22-06675 CI
NOTICE OF FILING COMPLAINT UNDER SEAL                              PAGE 2 OF 2
NOTICE OF FILING COMPLAINT UNDER SEAL.DOCX

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 72 of 90


## Service of Process Transmittal Summary

**TO:**    Shayla Graham
Cigna Companies
900 COTTAGE GROVE RD
BLOOMFIELD, CT 06002-2920

**RE:**    **Process Served in Alaska**

**FOR:**    Express Scripts Pharmacy, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | THE STATE OF ALASKA vs. EXPRESS SCRIPTS, INC. |
| **DOCUMENT(S) SERVED:** | Summons and Notice, Notice, Complaint(s) |
| **COURT/AGENCY:** | ANCHORAGE COUNTY - DISTRICT/SUPERIOR COURT, AK<br>Case # 3AN2308083CI |
| **NATURE OF ACTION:** | Summons and Notice to Both Parties of Judicial Assignment |
| **PROCESS SERVED ON:** | C T Corporation System, Juneau, AK |
| **DATE/METHOD OF SERVICE:** | By Process Server on 09/25/2023 at 13:15 |
| **JURISDICTION SERVED:** | Alaska |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after the day you receive this summons |
| **ATTORNEY(S)/SENDER(S):** | David Karl Gross<br>BIRCH HORTON BUTNER & CHEROT<br>510 L Street, #700<br>Anchorage, AK 99501<br>907-276-1550 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/26/2023, Expected Purge Date:<br>10/01/2023<br><br>Image SOP<br><br>Email Notification, Incoming Legal  legalandpublicaffairs-incominglegal@cigna.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>8585 Old Dairy Road, Ste 208<br>Juneau, AK 99801<br>800-448-5350<br>MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT



disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



## PROCESS SERVER DELIVERY DETAILS

**Date:**                       Mon, Sep 25, 2023
**Server Name:**         Drop Service

| Entity Served | EXPRESS SCRIPTS PHARMACY, INC. |
|---------------|-------------------------------|
| Case Number   | 3AN-23-08083CI                |
| Jurisdiction  | AK                            |

| Inserts | | |
|---------|--|--|
|  |  |  |



# IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA
## AT ANCHORAGE

THE STATE OF ALASKA,

                   Plaintiff(s),

vs.

EXPRESS SCRIPTS, INC., et al.

                   Defendant(s).

CASE NO. 3AN- 23 − 0 8083 CT

**SUMMONS AND
NOTICE TO BOTH PARTIES
OF JUDICIAL ASSIGNMENT**

To Defendant: Express Scripts Pharmacy, Inc.

You are hereby summoned and required to file with the court a written answer to the complaint which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave., Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition, a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented) David K. Gross _____, whose address is: 510 L Street, Suite 700, Anchorage, AK 99501 _____.

If you fail to file your answer within the required time, a default judgment may be entered against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this case, in writing, of your current mailing address and any future changes to your mailing address and telephone number. You may use court form *Notice of Change of Address / Telephone Number* (TF-955), available at the clerk's office or on the court system's website at https://public.courts.alaska.gov/web/forms/docs/tf-955.pdf to inform the court. - OR - If you have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

## NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

☒ This case has been assigned to Superior Court Judge Gandbhir and to a magistrate judge.

☐ This case has been assigned to District Court Judge _____.

CLERK OF COURT

8/31/23
Date

By: _____
Deputy Clerk

I certify that on 8/31/23 a copy of this Summons was ☐ mailed ☒ given to ☐ plaintiff ☒ plaintiff's counsel along with a copy of the ☐ Domestic Relations Procedural Order ☐ Civil Pre-Trial Order to serve on the defendant with the summons.
Deputy Clerk VSU

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If you have been served with this summons outside the United States, you also have 40 days to file your answer.

CIV-100 ANCH (10/17)(cs)
SUMMONS

Civil Rules 4, 5, 12, 42(c), 55

Treg R. Taylor, Attorney General
Margaret Patton Walsh
Department of Law
1031 W. Fourth Avenue, #200
Anchorage, AK 99501
Telephone: 907.269.5100
Facsimile: 907.276.3697

David Karl Gross
Mara E. Michaletz
Birch Horton Bittner & Cherot
510 L Street, #700
Anchorage, AK 99501
Telephone: 907.276.1550
Facsimile: 907.276.3680

Linda Singer (pro hac vice to be submitted)
Elizabeth Smith (pro hac vice to be submitted)
Motley Rice LLC
401 Ninth Street, N.W., #1001
Washington, DC 20004
Telephone: 202.386.9626
Facsimile: 202.386.9622

Attorneys for Plaintiff

**COPY**
Original Received

**AUG 3 1 2023**

Clerk of the Trial Courts

## IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
## THIRD JUDICIAL DISTRICT IN ANCHORAGE

| | |
|---|---|
| THE STATE OF ALASKA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Case No. 3AN-23*08083* CI |
| EXPRESS SCRIPTS, INC., EXPRESS | ) |
| SCRIPTS ADMINISTRATORS, LLC, | ) |
| MEDCO HEALTH SOLUTIONS, ESI | ) |
| MAIL PHARMACY SERVICE, INC., | ) |
| EXPRESS SCRIPTS PHARMACY, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## NOTICE OF FILING COMPLAINT UNDER SEAL

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 77 of 90

COMES NOW Plaintiff, the State of Alaska, by and through undersigned counsel, hereby submits the following Complaint, to be filed under seal. Only the parties and court personnel may view this Complaint. A redacted copy of the Complaint is also submitted herewith for public purposes.

DATED this 31st day of August, 2023.

BIRCH HORTON BITTNER & CHEROT
Attorneys for Plaintiff

By: _David Karl Gross_

David Karl Gross, ABA #9611065
Mara E. Michaletz, ABA #0803007
dgross@bhb.com
mmichaletz@bhb.com

STATE OF ALASKA
Treg R. Taylor, Attorney General
Margaret Paton Walsh, ABA #0411074
margaret.paton-walsh@alaska.gov

MOTLEY RICE LLC
Linda Singer (pro hac vice to be submitted)
Elizabeth Smith (pro hac vice to be submitted)
lsinger@motleyrice.com
esmith@motleyrice.com

STATE V. EXPRESS SCRIPTS, INC., ET AL.
NOTICE OF FILING COMPLAINT UNDER SEAL
NOTICE OF FILING COMPLAINT UNDER SEAL.DOCX

CASE NO. 3AN-22-06675 CI
PAGE 2 OF 2

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 78 of 90



## Service of Process Transmittal Summary

**TO:**     Shayla Graham
Cigna Companies
900 COTTAGE GROVE RD
BLOOMFIELD, CT 06002-2920

**RE:**     **Process Served in Delaware**

**FOR:**    Express Scripts, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: THE STATE OF ALASKA // To: Express Scripts, Inc. |
| **DOCUMENT(S) SERVED:** | Summons and Notice, Notice, Complaint(s) |
| **COURT/AGENCY:** | Alaska District - U.S. Superior Court - Anchorage, AK<br>Case # 3AN2308083CI |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - Opioid |
| **PROCESS SERVED ON:** | The Corporation Trust Company, Wilmington, DE |
| **DATE/METHOD OF SERVICE:** | By Process Server on 09/22/2023 at 12:04 |
| **JURISDICTION SERVED:** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after the day of receipt |
| **ATTORNEY(S)/SENDER(S):** | David K. Gross<br>Birch Horton Bittner & Cherot<br>510 L Street, Suite 700<br>Anchorage, AK 99501<br>907-276-1550 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/23/2023, Expected Purge Date: 09/28/2023<br><br>Image SOP<br><br>Email Notification,  Incoming Legal  legalandpublicaffairs-incominglegal@cigna.com |
| **REGISTERED AGENT CONTACT:** | The Corporation Trust Company<br>1209 Orange Street<br>Wilmington, DE 19801<br>800-448-5350<br>MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT



disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

 Wolters Kluwer

# PROCESS SERVER DELIVERY DETAILS

**Date:**                               Fri, Sep 22, 2023
**Server Name:**                        Adam Golden

| Entity Served | EXPRESS SCRIPTS, INC. |
|---|---|
| Case Number | 3AN-23-08083CI |
| Jurisdiction | DE |

| Inserts |
|---|
|  |



# IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA
## AT ANCHORAGE

THE STATE OF ALASKA

)
)
—————————————————— )
Plaintiff(s),          )
vs.                    )
)
EXPRESS SCRIPTS, INC. et al.    )    CASE NO. 3AN-23-08083CI
)
—————————————————— )    **SUMMONS AND**
Defendant(s).          )    **NOTICE TO BOTH PARTIES**
—————————————————— )    **OF JUDICIAL ASSIGNMENT**

To Defendant: Express Scripts, Inc.

You are hereby summoned and required to file with the court a written answer to the complaint which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave., Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition, a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented) David K. Gross _____, whose address is: 510 L Street, Suite 700, Anchorage, AK 99501 _____.

If you fail to file your answer within the required time, a default judgment may be entered against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this case, in writing, of your current mailing address and any future changes to your mailing address and telephone number. You may use court form *Notice of Change of Address / Telephone Number* (TF-955), available at the clerk's office or on the court system's website at https://public.courts.alaska.gov/web/forms/docs/tf-955.pdf to inform the court. - OR - If you have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

## NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

☒ This case has been assigned to Superior Court Judge Gandbhir _____. and to a magistrate judge.

☐ This case has been assigned to District Court Judge _____.

CLERK OF COURT

9/12/23
Date

By: _____
Deputy Clerk

I certify that on 9/12/23 a copy of this summons was ☒ e-mailed ☐ given to ☐ plaintiff ☒ plaintiff's counsel along with a copy of the ☐ Domestic Relations Procedural Order ☐ Civil Pre-Trial Order to serve on the defendant with the summons.
Deputy Clerk _____

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If you have been served with this summons outside the United States, you also have 40 days to file your answer.

CIV-100 ANCH (10/17)(cs)                    Civil Rules 4, 5, 12, 42(c), 55
SUMMONS

Treg R. Taylor, Attorney General
Margaret Patton Walsh
Department of Law
1031 W. Fourth Avenue, #200
Anchorage, AK 99501
Telephone: 907.269.5100
Facsimile: 907.276.3697

David Karl Gross
Mara E. Michaletz
Birch Horton Bittner & Cherot
510 L Street, #700
Anchorage, AK 99501
Telephone: 907.276.1550
Facsimile: 907.276.3680

Linda Singer (pro hac vice to be submitted)
Elizabeth Smith (pro hac vice to be submitted)
Motley Rice LLC
401 Ninth Street, N.W., #1001
Washington, DC 20004
Telephone: 202.386.9626
Facsimile: 202.386.9622

Attorneys for Plaintiff

**COPY**
Original Received

AUG 3 ? 2023

Clerk of the Trial Courts

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT IN ANCHORAGE

| | |
|---|---|
| THE STATE OF ALASKA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Case No. 3AN-23*08083* CI |
| EXPRESS SCRIPTS, INC., EXPRESS | ) |
| SCRIPTS ADMINISTRATORS, LLC, | ) |
| MEDCO HEALTH SOLUTIONS, ESI | ) |
| MAIL PHARMACY SERVICE, INC., | ) |
| EXPRESS SCRIPTS PHARMACY, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## NOTICE OF FILING COMPLAINT UNDER SEAL

STATE V. EXPRESS SCRIPTS, INC., ET AL.                    CASE NO. 3AN-22-06675 CI
NOTICE OF FILING COMPLAINT UNDER SEAL                          PAGE 1 OF 2
NOTICE OF FILING COMPLAINT UNDER SEAL.DOCX

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 83 of 90

COMES NOW Plaintiff, the State of Alaska, by and through undersigned counsel, hereby submits the following Complaint, to be filed under seal. Only the parties and court personnel may view this Complaint. A redacted copy of the Complaint is also submitted herewith for public purposes.

DATED this 31st day of August, 2023.

BIRCH HORTON BITTNER & CHEROT
Attorneys for Plaintiff

By: _David Karl Gross_

David Karl Gross, ABA #9611065
Mara E. Michaletz, ABA #0803007
dgross@bhb.com
mmichaletz@bhb.com

STATE OF ALASKA
Treg R. Taylor, Attorney General
Margaret Paton Walsh, ABA #0411074
margaret.paton-walsh@alaska.gov

MOTLEY RICE LLC
Linda Singer (pro hac vice to be submitted)
Elizabeth Smith (pro hac vice to be submitted)
lsinger@motleyrice.com
esmith@motleyrice.com

STATE V. EXPRESS SCRIPTS, INC., ET AL.                    CASE NO. 3AN-22-06675 CI
NOTICE OF FILING COMPLAINT UNDER SEAL                              PAGE 2 OF 2
NOTICE OF FILING COMPLAINT UNDER SEAL.DOCX

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 84 of 90


## Service of Process Transmittal Summary

**TO:**   Shayla Graham
Cigna Companies
900 COTTAGE GROVE RD
BLOOMFIELD, CT 06002-2920

**RE:**   **Process Served in Alaska**

**FOR:**   Express Scripts Administrators, LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | THE STATE OF ALASKA vs. EXPRESS SCRIPTS, INC. |
| **DOCUMENT(S) SERVED:** | Summons and Notice, Notice, Complaint(s) |
| **COURT/AGENCY:** | ANCHORAGE COUNTY - DISTRICT/SUPERIOR COURT, AK<br>Case # 3AN2308083CT |
| **NATURE OF ACTION:** | Summons and Notice to Both Parties of Judicial Assignment |
| **PROCESS SERVED ON:** | C T Corporation System, Juneau, AK |
| **DATE/METHOD OF SERVICE:** | By Process Server on 09/25/2023 at 13:15 |
| **JURISDICTION SERVED:** | Alaska |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after the day you receive this summons |
| **ATTORNEY(S)/SENDER(S):** | David Karl Gross<br>Birch Horton Bittner & Cherot<br>510 L Street, #700<br>Anchorage, AK 99501<br>907-276-1550 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/26/2023, Expected Purge Date:<br>10/01/2023<br><br>Image SOP<br><br>Email Notification,  Incoming Legal  legalandpublicaffairs-incominglegal@cigna.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>8585 Old Dairy Road, Ste 208<br>Juneau, AK 99801<br>800-448-5350<br>MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT




Wolters Kluwer

## PROCESS SERVER DELIVERY DETAILS

**Date:** Mon, Sep 25, 2023
**Server Name:** Drop Service

| Entity Served | EXPRESS SCRIPTS ADMINISTRATORS, L.L.C. |
|---|---|
| Case Number | 3AN-23-08083CI |
| Jurisdiction | AK |

| Inserts | | |
|---|---|---|
| | | |



IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA
AT ANCHORAGE

THE STATE OF ALASKA,

_____ )
Plaintiff(s),                   )
vs.                             )
                                )
EXPRESS SCRIPTS, INC., et al.   )  CASE NO. 3AN-23- 08083 CI
                                )
_____ )  **SUMMONS AND**
Defendant(s).                   )  **NOTICE TO BOTH PARTIES**
                                )  **OF JUDICIAL ASSIGNMENT**

To Defendant: Express Scripts Administrators, LLC

You are hereby summoned and required to file with the court a written answer to the complaint
which accompanies this summons. Your answer must be filed with the court at 825 W. 4th
Ave., Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In
addition, a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if
unrepresented) David K. Gross _____, whose address is:
510 L Street, Suite 700, Anchorage, AK 99501 .

If you fail to file your answer within the required time, a default judgment may be entered
against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in
this case, in writing, of your current mailing address and any future changes to your mailing
address and telephone number. You may use court form *Notice of Change of Address /
Telephone Number* (TF-955), available at the clerk's office or on the court system's website at
https://public.courts.alaska.gov/web/forms/docs/tf-955.pdf to inform the court. - OR - If you
have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

☒ This case has been assigned to Superior Court Judge Gandbhir           .
   and to a magistrate judge.

☐ This case has been assigned to District Court Judge _____ .

                                        CLERK OF COURT

8/31/23                                 By: _____
Date                                        Deputy Clerk

I certify that on 8/31/23 a copy of this Summons was  ☐ mailed  ☒ given to
☐ plaintiff  ☒ plaintiff's counsel along with a copy of the
☐ Domestic Relations Procedural Order  ☐ Civil Pre-Trial Order
to serve on the defendant with the summons.
Deputy Clerk JSU

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If
you have been served with this summons outside the United States, you also have 40 days to
file your answer.

CIV-100 ANCH (10/17)(cs)
SUMMONS                                 Civil Rules 4, 5, 12, 42(c), 55

Treg R. Taylor, Attorney General
Margaret Patton Walsh
Department of Law
1031 W. Fourth Avenue, #200
Anchorage, AK 99501
Telephone: 907.269.5100
Facsimile: 907.276.3697

David Karl Gross
Mara E. Michaletz
Birch Horton Bittner & Cherot
510 L Street, #700
Anchorage, AK 99501
Telephone: 907.276.1550
Facsimile: 907.276.3680

Linda Singer (pro hac vice to be submitted)
Elizabeth Smith (pro hac vice to be submitted)
Motley Rice LLC
401 Ninth Street, N.W., #1001
Washington, DC 20004
Telephone: 202.386.9626
Facsimile: 202.386.9622

Attorneys for Plaintiff

**COPY**
Original Received

**AUG 3 1 2023**

Clerk of the Trial Courts

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT IN ANCHORAGE

| | |
|---|---|
| THE STATE OF ALASKA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Case No. 3AN-23_08083_ CI |
| EXPRESS SCRIPTS, INC., EXPRESS | ) |
| SCRIPTS ADMINISTRATORS, LLC, | ) |
| MEDCO HEALTH SOLUTIONS, ESI | ) |
| MAIL PHARMACY SERVICE, INC., | ) |
| EXPRESS SCRIPTS PHARMACY, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## NOTICE OF FILING COMPLAINT UNDER SEAL

COMES NOW Plaintiff, the State of Alaska, by and through undersigned counsel,

hereby submits the following Complaint, to be filed under seal. Only the parties and

court personnel may view this Complaint. A redacted copy of the Complaint is also

submitted herewith for public purposes.

DATED this 31ˢᵗ day of August, 2023.

BIRCH HORTON BITTNER & CHEROT
Attorneys for Plaintiff

By: David Karl Gross,

David Karl Gross, ABA #9611065
Mara E. Michaletz, ABA #0803007
dgross@bhb.com
mmichaletz@bhb.com

STATE OF ALASKA
Treg R. Taylor, Attorney General
Margaret Paton Walsh, ABA #0411074
margaret.paton-walsh@alaska.gov

MOTLEY RICE LLC
Linda Singer (pro hac vice to be submitted)
Elizabeth Smith (pro hac vice to be submitted)
lsinger@motleyrice.com
esmith@motleyrice.com

Case 3:23-cv-00233-JMK   Document 1-1   Filed 10/12/23   Page 90 of 90